**WINSTON KEVIN McKESSON, ESQ.**
**(State Bar Number 106068)**
**LAW OFFICES OF WINSTON KEVIN McKESSON**
315 South Beverly Drive, Suite 305
Beverly Hills, California 90212
Telephone: [310] 277.9595
Facsimile: [310] 277.0177
cathrynjcollins@yahoo.com

Attorneys for Defendant,
GREGORY WONG

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. : **CR 06-530(A) SJO** |
| Plaintiff, | **DEFENDANT'S POSITION PAPER REGARDING SENTENCING** |
| -vs- | |
| GREGORY WONG, | TIME : **8:30 a.m.**<br>DATE : ***November 5, 2007***<br>PLACE : **Courtroom 16** |
| Defendant. | [ Before District Judge The *Honorable James Otero, II* ] |

**TO: THE PLAINTIFFS AND THE ASSISTANT UNITED STATES DISTRICT ATTORNEY, BRUCE SEARBY:**

The Defendant **GREGORY WONG** , hereby submits his posistion paper regarding sentencing by and through the Law Offices of Winston Kevin McKesson.

**GREGORY WONG**, is a caring son, and productive businessman  has devoted his professional life to coming to the aid of those less fortunate. He is a deeply spiritual man who despite his advancing years and questionable health still has a lot to offer our community.

The attached biography and numerous letters serve as a fitting testimony to his

-1-

1 character and accomplishments. ( See exhibit "A" and exhibit "B" ).

2 **Loss of Time Between Crimes**.

3 *United States v. Oligmueller,* 198 F. 3d 669 (8th Cir 1999) (upheld downward
4 departure were actual loss amount of $829,000 stemming from false loan application
5 overstated risk of defrauded bank warranting use of loss figure of $58,000 and offense
6 level 11 where D has sufficient unpledged assests to support the loan amount and had
7 paid the bank $836,000 of the amount owed when fraud discovered); *United States v.*
8 *Brennick,* 134 F.3d10 (1st Cir. 1998/) (downward departure in tax evasion case can be
9 appropriate where D fully intended to pay but could not, but extend of departure (30
10 months) was not justified); *United States v. Walters*, 87 F.3d 663 (5th Cir. 1996) (in
11 money laundering case, district court reasonably departed downward by six months
12 where D did not personally benefit from the fraud; lack of benefit was not considered
13 by the guidelines; so §5K2.0 authorizes departure); *United States v. Broderson* 67 F.3d
14 452 (2d Cir. 1995)(in white collar contracts fraud by president of Gruman Data, seven
15 level departure o.k. in part because D did not profit personally, contracts were
16 favorable to the government, and "calculated loss significantly... overstated the
17 seriousness of the defendant's of the defendant's conduct: - see §2F1.1 comment.
18 (N7(b)); *United States v. Monaco*, 23F.3d 793, 799 (3d Cir. 1994)(D's intent not to
19 steal money from U.S. but to expedite payment that would have been due as some
20 future time); *United States v. Rostoff,* 53 F.3d 398 (1st Cir. 1995) (multiple causes of
21 the losses including permissive attitude of bank's senior management, buyer's greed,
22 and unexpected nosedive of condo market warranted downward departure); *United*
23 *States v Gregorio*, 956 F.2d 341 (1st.Cir. 1992) (departure granted because losses
24 resulting from fraudulently obtained loan were not caused solely by the defendant
25 misrepresentation).

26 ///
27 ///
28 ///

DEFENDANT'S POSITION PAPER REGARDING SENTENCING

## The Defendant's Crime Constituted Aberrant Behavior.

*See United States v. Working*, 224 F.3d 1093 (9th Cir. 2000) (*en banc*) (where woman convicted of attempted murder of husband and use of firearm, when he threatened divorce and taking children, district court may properly depart 21 levels (from range of 87 to 108 months to one day) for aberrant conduct even though crime well-planned and relentlessly executed, but remanded for court give reasons for extent. Defendant had to serve five year sentence for 924 (c) conviction, and district court said convergence of factors showed (1) singular nature of the act; (2) spontaneity and lack of planning; (3) psychological disorder (depression); (6) extreme pressure; (7) letters from friends expressing shock and (8) motivation of defendant was not greed); *United States v. Lam*, 20 F .3d 999, 1003-05 (9th Cir. 1994) (where law-abiding) immigrant obtained a sawed-of shotgun to protect his family against predators after he and pregnant sister were robed by three gunman, and where D not aware that he possessed illegal weapon, and where only prior driving without a license, court had discretion to downward depart from 18 month sentence because of aberrant conduct-note court rejects view that aberrant conduct must be single incident; and rejects view that must be first offense); *United States v. Fairless*, 975 F.2d 664(9th Cir. 1992) (bank robbery, down on the floor, with unloaded gun, in light of depression, loss of job, first offense, "shocked" response of family constitutes aberrant behavior justify downward departure from 60 to 30 months); *United States v. Garcia*, 182 F.3d 1165, 1176 (10th Cir. 1999) (that defendant's crime was "carefully planned" did not preclude finding of aberrant behavior because the correct focus is not on the number of discrete acts undertaken by the defendant but rather on the aberrational character of conduct); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (where defendant pled guilty to possession of a firearm by a prohibited person, the district court did not abuse its discretion in departing downward by three levels to probation when had been law abiding until age 35 when his marriage disintegrated).

///

- 3 -

1 **To Enable Defendant To Make Restitution.**

2 *United States v. Blackburn*, 105 F.Supp.2d 1067 (D.S.D. 2000) (where D pled

3 guilty to failure to pay child support and was $15,000 in arrears, and where guideline

4 called for 12-18 months of imprisonment with one year of supervised release,

5 imprisonment counter-productive towards payment of child support, and court grants

6 downward departure on its own motion to probation to make sure that defendant would

7 be subjected to a longer term of supervision, which would have been possible if

8 imprisonment imposed).

9 **Age**.

10 *United States v. Higgins*,, 967 F. 2d 841 (3d Cir. 1992) ( young age and stable

11 employment will justify a downward departure if "extraordinary"; remanded to see if

12 judge realized he had power); *United States v. Dusenberry*, 9 F3.d 110 (6th Cir 1993)

13 (downward departure granted due to defendant's age and medical condition - removal

14 of both kidneys requiring dialysis three times a week); *United States v. Baron*, 914

15 F.Supp. 660, 662-665 (D.Mass. 1995)( in bankruptcy fraud, downward departure from

16 range of 27-33 months to probation and home detention to a 76-year old defendant

17 with medical problems which could be made worse by incarceration).

18 **Excellent Employment History**.

19 *United States v. Thompson*, 74 F.Supp.2d 69 (D.Mass. 1999) (departure from

20 87 to 60 months in drug case-setting out framework for determining when employment

21 history and family ties warrant downward departure as extraordinary - here "not only

22 did defendant exhibit a sustained commitment to his family dating back to the instant

23 he became a father, he consistently worked to provide for them"), **reversed** 234 F.3d

24 74 (1st Cir. 2000) (district court erred in limiting its inquiry to cases involving crack

25 cocaine dealers and then asking whether defendant's record stood apart from the rest);

26 *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (where defendant pled guilty to

27 possession of a firearm by a prohibited person, the district court did not abuse its

28 discretion in departing downward by three levels when, as one of eleven factors, it

-4-

1  considered the defendant's long impressive work history . . . where good jobs are
2  scarce." Even though under §5H1.5 ordinarily a discouraged basis here unusual);
3  *United Sta tes v. Higgins*, 967 F.2d 841 (3d Cir. 1992) (young age and stable
4  employment will justify a downward departure if "extraordinary"; remanded to see if
5  judge realized he had power); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991)
6  (long-standing employment at two jobs); *United States v. Jagmohan*, 909 F.2d 61 (2d
7  Cir. 1990) (exceptional employment history and nature of the crime); *United States v.*
8  *Big Crow*, 898 1326, 1331-32 (8TH CIR 19900 (excellent employment record) *United*
9  *States v. Shoupe*, 998 F.2d; *United States v. Ragan*, 952 F.2d 1049 (8th Cir. 1992) (
10  defendant stopped using drugs a year before his indictment, maintained steady
11  employment, and offered to cooperate-departure affirmed where government did not
12  object at sentencing).

13  **Defendant Responsible For Only Part of Loss.**

14      The district may depart downward if a defendant was not involved in all of his
15  co-conspirators efforts to defraud investor, causing the loss figure to overstate the
16  defendant's culpability. Case remanded to see whether 10 level departure appropriate.
17  *United States v. Arutunoff*, 1 F.3d 1112 (10th Cir. 1993); *United States v. Gregorio*, 956
18  F.2d 341. 344-348 (1st Cir. 1992) (multiple causation of victim loss justifies downward
19  departure).

20  **Defendant Subject to Abuse In Prison.**

21      *United States v. Volpe*, 78 F.Supp.2d 76, 89 (E.D.N.Y. 1999) ("Volpe II")
22  (Defendant entitled to two-level departure because "[t]he extraordinary notoriety of
23  this case and the degree of general opprobrium toward Volpe . . . , coupled with [his]
24  status as a police officer," left him "unusually susceptible to abuse in prison" and D
25  may have to spend most of his time in segregation); *United States v. Bruder*, 103
26  F.Supp2d 155, 182 (E.D.N.Y. 2000) (same).

27  ///

28  ///

DEFENDANT'S POSITION PAPER REGARDING SENTENCING

**The Totality of The Circumstances**.

The district court is authorized to depart downward when the "combination of factors" indicate that a departure is appropriate. *United States v. Cook*. 938 F.2d 149, 153 (9th Cir. 1991); *United States v. Lam*, 20 F.3d 999, 1003–005 (9th Cir. 1994) ("a number of convergent factors" supported conclusion that D's conduct aberrant); *United States v. Coleman*, 188 F.3d 354, 360 (6th Cir. 1999) (*en banc*) (downward departure may be based on a aggregation of actors each of which might in itself by insufficient to justify a departure may be based on an aggregation of factors each of which might in itself be insufficient to justify a departure); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998); *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) ( following *Koon*, based on D's health problems - severe kidney disease and good acts - charitable fund-raising - departure from level 20 level 10 and sentence of probation approved); *United States v. Fletcher*, 15 F. 3d 553 (6th Cir. 1994) (combination of factors including age of priors justified departure from career offender); *United States v. Parham*, 16 F.3d 844 (8th Cir. 1994) *United States v. Broderson*, 67 F. 3d 452, 458-59 (2d Cir. 1995) (relying on *United States v. Rivera*, 994 F. 2d 942 (1st Cir. 1993) (Breyer, J.) In fraud case, district court has "better feel" for unique circumstances of the case: here combination of factors - loss overstated seriousness of D's conduct; restitution paid; no personal benefit; contract favorable to government – justify 7 level departure); *United States v. Cuevas-Gomez*, 61 F.3d 749 (9th Cir. 1995) (court may depart in aggravated reentry case event though directed by guidelines to increase offense level by 16 levels).

*Sua Sponte* **Departure By Court.**

*United States v. Ekhator*, 17 F.3d 53 (2d Cir. 1994) (even where D agreed not to ask for downward departure, court may do so *sua sponte* if unusual family circumstances ; remanded); *United States v. Williams*, 65 F.3d 301, 309-310 (2d Cir. 19950 ("we wish to emphasize that the Sentencing Guidelines do not displace the traditional role of the district court in bringing compassion and common sense to the

DEFENDANT'S POSITION PAPER REGARDING SENTENCING

sentencing processed . . . In areas where the Sentencing Commission has not spoken . . . district courts should not hesitate to use their discretion in devising sentences that provide individualized justice"); *United States v. Blackburn*, 105 F.Supp.2d 1067 (D.S.D. 2000(where D pled guilty to failure to pay child support and was $15,000 in arrears, and where guideline called for 12-18 months of imprisonment with one years of supervised release, court notes imprisonment counterproductive towards payment of child support and grants downward departure on its own motion so court could impose a sentence of probation rather than imprisonment to make sure that defendant would be subjected to a longer term of supervisor tht wuld have been possible if sentence of imprisonment imposed); *United States v. Gonzale-Bello*, 10 F. Supp.2d 232 (E.D.N.Y. 1998) (substantial downward departure for emotionally disturbed Venezuelan woman who carried drugs and who was prevented by her attorney from cooperating with the government because he was hired by her handlers).

DATED: October 23, 2007

Respectfully submitted,
LAW OFFICES OF
WINSTON KEVIN McKESSON

By:

WINSTON KEVIN McKESSON , ESQ.
Attorney for Defendant
GREGORY WONG

DEFENDANT'S POSITION PAPER REGARDING SENTENCING

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT "A"

26
27
28

DEFENDANT'S POSITION PAPER REGARDING SENTENCING

## GREG WONG: LIFE and TIMES

1936        Born in Cuba on December 24.

1943-1955   Attended Colegio Presbiteriano (primary) graduated; attended
            Instituto de Remedios (secondary) graduated.

1955        Migrated to the U.S.A., attended Tennessee Polytechnic Institute.
            Major: engineering. While attending TPI, he worked in a family
            restaurant to pay for his education.

1956        Spent summer working in Chicago.

1957        Spent summer working in Los Angeles. Worked as a machine operator
            and helped his cousin with a newspaper route. He later returned to
            Tennessee to continue his studies.

1958        He then returned to Los Angeles to attend Pacific States University.
            Major: engineering. Graduated in 1962. He took various courses at
            U.C.L.A. extension.

1962        Took a position as an engineer for the Leach Corporation, and in the
            evening, he worked for Bankers Life as a door-to-door salesman.
            Received many awards for over 25 years providing services to clients
            and was the number one salesman in the office for many, many years.

1985        Greg took what would become his life's work. He opened a private
            career college under the name of California Business Institute (CBI).
            CBI was opened with one student.

1987        CBI was accredited by ACCET. You may ask what is "accreditation"
            and what does it mean?

                    Basically, accreditation is a process that gives public
                    recognition to institutions that meet certain standards.
                    It is a promise that an institution will provide the
                    quality of education it claims to offer. Accreditation
                    assures the student that the institution operates on a
                    sound financial basis, has an approved program of
                    study, qualified instructors, adequate facilities and
                    equipment, approved recruitment and admission policies,
                    and advertises its courses truthfully.

            ### WHY IS ACCREDITATION IMPORTANT?

            Accreditation responds to the public's demands for
            improved quality and greater accountability for institutions
            serving society's needs. Accreditation agencies enjoy a
            unique "public trust" role in the United States.
            Accredited schools can be trusted by the public to be
            what they claim they are and to do what they claim to do.
            Whatever an accredited school says about itself has both
            the sanction and the confidence of the profession.

Accreditation encourages and facilitates school improvement...

Accreditation provides a means for public accountability...

Accreditation fosters stakeholder involvement and commitment...

Accreditation builds positive public relations by fostering...

* A focus on student performance and growth

* A culture of accountability in student performance

* A planning ethic

* Commitment to continuous improvement

* Involvement of representative constituents

WHY ACCREDIT YOUR INSTITUTION?

Certification to the public that the school is a trustworthy institution of learning validates the integrity of a school's program and student transcripts.

Fosters improvement of the school's programs and operations to support student learning.

Assures a school community that the school's purposes are appropriate and being accomplished through a viable educational program.

A way to manage change through regular assessment, planning, implementing, monitoring and reassessment.

Assists a school in establishing its priority areas for improvement as a results of the perpetual accreditation cycle that includes:

* School self-assessment of the current educational program for students

* Insight and perspective from the visiting committee

* Regular school staff assessment of progress through the intervening years between  full self-studies.

Accreditation is required in order to qualify for Pell Grants and Cal Grants.

Many government funded training opportunities require accreditation before schools can participate.

We may ask in what ways was his life remarkable?

Greg was raised with a strong work ethic: however his development while living in Cuba was limited by his immediate environment. His family's means were meager; however he was clear on the values which his parents imparted to him.

When he left Cuba, he did not for one minute forget the financial hardship he left behind in Cuba. Having only just arrived in the United States, he did not go wild with the freedoms that existed in the U.S.; no his only and driving thought was to do whatever it took to bring his family to the U.S. in order for them to live the "AMERICAN DREAM", and he accomplished that admirable feat.

1974      Greg became an American citizen.

1980      Greg's father was killed in an accident and from that time until her death in 2006, he totally assumed all care for his mother.

In reviewing his life, it becomes clear that Greg was an admirable person. Until he opened CBI, he always maintained two jobs to provide a better future for his family and self.

The trait of being admirable was even more evident once he opened CBI and had an opportunity to utilize his innate desire to help, he picked a very high risk population in order to instruct in skill training that would lift them out of deplorable conditions by giving each student a skill, which enabled them to earn a living and help themselves and their families thrive just as Greg helped his family and self come to America and prosper. Greg is a hero to many, whose lives' were changed forever.

The human qualities that were most influential in shaping the way he lived and influenced him came from his father and mother, both of whom were Chinese immigrants. They were good, upright people who taught their children in the traditional family values of respect, consideration, and honesty to all others. His father and mother constantly advised him about the value of a good education. This was the ultimate motivation for Greg to offer a good and valuable education to as many students as wanted to accept the education. Both his parents knew that "knowledge is power".

In chronicling his life it is clear that the quality or trait that proved most troubling and difficult was based on a mistake or bad decision. **What happened to this man who was raised of strong values?** Greg Wong is a life-long person of honesty, integrity, and good works. However, no where in his history had he encountered devious **"con-artists"** who represented one thing, while planning entirely different outcomes. It must be said that he was a naive person.

We must remember that for his entire life he has helped his family and those in his community who wanted to improve their condition through education and training.

1998    As his institute continued to expand he experienced the need to hire a "qualified" Financial Aid Director. **The beginning of the end** for him occurred the day he hired DeAnne K. Williams in 1998, now disgraced, Financial Aid Consultant. Not only was this act the poorest business decision that he ever made; it was one that victimized this man, and was so vicious that he will live with the outcome and effect for the rest of his life.

Ms. Williams set to work to develop a scheme that would greatly benefit herself and her accomplices in the financial aid department of CBI. Her credentials came from U.S.D.O.E., which gave Greg a secure feeling about what was happening in his financial aid department. As an additional layer of compliance protection he hired a third party processor to oversee the operation of the department. So, for some time she had everybody including Greg fooled. The problem finally was that he was responsible for the operations of the school.

3/4

The "system" has no tolerance for non-compliance, which is understandable. What is difficult to understand is that the government believed that Wong participated in this scheme? Even a casual view of the life of Greg Wong would make it highly unlikely that he could do such a thing after living for years and years as a straight arrow.

2001       So, after years of beneficial operation, Greg filed chapter bankruptcy and CBI was closed in an orderly fashion. However, what followed is a scenario brought on by governments' case against Wong and others.

2006       Next, federal investigators came to his home and obtained hand-writing samples. Of this event Wong quoted:

**"I AM UNEQUIVOCALLY INNOCENT OF ALL THE OBSCURE ALLEGATIONS .**

2007       I was indicted for a crime that I did not commit. I feel very sad for the results of the poor business decision made when I hired Williams, however this was a poor business decision only, I did not steal any funds from the federal government; and there are no unaccounted funds related to CBI, as I have proven time after time. I believe I was victimized, used and abused by DeAnne Wiliams. She violated by trust.

It is very sad, that I have this problem in the later part of my life.

A good testimony to my character and my honesty in conducting my business and my life is demonstrated by my friends and acquaintances. I have received several character letters"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "B"

DEFENDANT'S POSITION PAPER REGARDING SENTENCING



**David Richmond**
Investment Representative
CA Ins. Lic. #0B10333

159 E. Live Oak Ave., Suite 100
Arcadia, CA 91006
Office: (626) 446-3031
Fax: (626) 446-2960
Cell: (626) 222-7647

FINANCIAL
SERVICES

September 24, 2007

To Whom It May Concern:

I have known Greg Wong in a variety of capacities for many years. He has been a client for over ten of those years. In addition, he is my friend and we have worked together on several small business deals. He is responsible and keeps meticulous files when it comes to recordkeeping.

Greg is organized, efficient, extremely competent, and has an excellent rapport with people of all ages. He has old fashioned values and I would trust him in all situations.

In summary, Greg is very trustworthy and has the most integrity of anyone I know.

If you have any questions, please do not hesitate to contact me.

Sincerely,

David Richmond

# HERMAN H. PETTEGROVE

Attorney At Law

October 3, 2007

Mr. Greg Wong
115 Orange St.
San Gabriel, CA 91776

Dear Greg:

You have asked me for a reference letter in connection with my dealings with you over the last 10 years when I have been employed as your tax preparer and attorney.

You came to my office in about 1999 after closing your vocational school business and retiring. I asked about your background and you described some of the tribulations you had encountered as an immigrant which reminded me of what my parents told me about their arrival in the United States.

Consistently, throughout our relationship, you have exhibited punctilious honesty in every number you have given me and superb record-keeping. Repeatedly, you have provided documents that none of my clients would have kept. Recently, we concluded a dispute with the IRS in which it turned out they had completely misconstrued the facts of the case and you were able to provide 10 year old documents that proved that your version of the incident was correct.

I could not do any more than refer you to anyone needing clerical assistance. More important, though, has been the consistent probity of your comments to me and the incredible ability you have to support your comments with documents.

If anyone were to ask I could only say to them, "this is a good man with whom I would trust my estate."

Yours truly,

Herman H. Pettegrove

HP/hs

September 26, 2007

To Whom It May Concern:

I felt quite honored when my uncle, Greg Wong asked me to write a character reference for him. I am a forty year old woman, mother of two and a civil service employee who has worked for the USDA Forest Service for the past eight years, and I have known my uncle all my life.

I have always known my uncle Greg to be an honest, generous and hard-working individual who has throughout the years continually been dedicated to family.

I have fond memories of family visits with my uncle. He made it a priority to always set time aside in order to spend time with my two younger brothers and me. I remember excitement would 'hang in the air' for days, even weeks when there was mention of a visit from our uncle! As I became older, I appreciated my uncle's attentiveness in a different way. He was and continues to be an individual who is 'there' to listen and not judge. When posed with the question, *"What do you think Uncle?"* - I know I can always count on an honest answer with perspective to my question or issue at hand.

I have also known my uncle, Greg as a very generous individual. As a young adult, I had decided to move from my small hometown with a population of 8,000 to the big city! I left Alaska to move to Los Angeles. I had big plans of earning a living and saving money to attend school. Of course, now that I look back, I was young and a bit naïve. I did not understand how difficult it was to make a decent living while earning a minimum wage and at the same time trying to save money for school. My uncle understood my struggle and the importance of pursuing my endeavor of higher education. He allowed me to live with him and my grandmother rent-free. He supported me by providing a roof over my head. Within a couple of months, I was able to enroll in higher education courses while working only part-time - so as I could dedicate time to my studies. I lived with my uncle and grandmother for over a year until I decided to transfer to a University in Washington State.

My uncle's generosity had an impact on me in that he helped facilitate an opportunity for me to better myself. He helped me get off on the "right foot" so to speak. I think back now and realize that if I had not attended school while still young, I may not have when I was older. I currently hold a Bachelor of Arts and much of this is due to my uncle's support and belief that higher education is important and can make a difference in an individual's life.

In addition to the support he has provided me, I have also witnessed the dedication and care he provided to my recently departed grandmother. My grandmother had always lived with my uncle up until her death last year at ninety-four years of age. The past last ten years, my grandmother suffered from dementia and various other physical problems, those which typically accompany the aging process.

My uncle was her sole provider and caretaker for all her daily needs e.g. bathing, feeding, doctor appointments, daily outings etc. Anyone who has cared for the very elderly understands how much work it is to care for them. My uncle **never** complained. Even when he was working full time, he was dedicated to providing quality care to his mother - my grandmother. His dedication to her was unfailing.

I could continue with many other descriptions of my uncle, Greg's many other good qualities. Instead, I would like to simply say how highly I think of him. He serves as an example of a human being with exceptional characteristics – Someone I have always looked up to.

If any additional information is required, please do not hesitate to contact me at my phone of (907) 738-2306.

Sincerely,

SUSAN M. JONES
Niece of Greg Wong

October 1, 2007

To Whom It May Concern:

I have known Mr. Greg Wong for 37 years in several capacities. First and foremost, I chose him to be my Best Man, the person I wanted at my side at the most important moment in my life. His reliability, loyalty, and maturity made him worthy of this honor. He was my main moral support at a very emotional time, well-suited for this responsibility. Both my wife and I know we could call upon him at any time to continue to support us.

As one of my customers for these many years, I have experienced Greg to consistently pay his accounts, and to be honest and professional in all his business-dealings with me. I would not have continued this relationship if he was anything less.

I trust that you, too, will find him to be a man of his word.

Sincerely,

Ermanno Marzorati
President
Star Office Machines

SEPTEMBER 30, 2007

TO WHOM IT MAY CONCERN:

MY WIFE MARGARET ALDERETE AND MYSELF HAVE KNOWN GREGORY WONG AND HIS FAMILY AS FAR BACK AS 1975. WE KNEW AND VISITED WITH HIS MOTHER, AURORA, MANY TIMES. SHE WAS A GENTLE AND GENEROUS SOUL.

WE HAVE ALWAYS ADMIRED GREGORY WONG WHO SO LOVINGLY TOOK CARE OF HIS MOTHER ESPECIALLY AFTER SHE BECAME A WIDOW IN 1980 TO THE TIME OF HER DEATH IN OCTOBER OF 2006. HIS MOTHER WOULD ALWAYS TELL US HOW KIND HE WAS TO HER AND THE MANY THINGS HE DID TO HELP OTHERS.

WE HAVE ALWAYS FELT THAT GREGORY WONG IS A VERY SINSCERE MAN, ALWAYS RESPECTFUL, FRIENDLY AND VERY HELPFUL WHEN NEEDED.

SINCERELY,

Robert Alderete

To Whom It May Concern,

I am very pleased to write a character reference for Greg Wong.

Greg and I are good friends, although I met him years ago as a result of business. I have known Greg for about 30 years. During that time I have always been amazed at how fair-minded, honest, and trustworthy he is.

Greg is a quiet, rather conservative individual who worked hard to provide the very best environment for his students and employees. We had discussions regarding students' benefits and how he could make improvements that would accrue to the advantage of all of his students and employees. I knew him not to have a selfish bone in his body.

Greg has been a hard working, and industrious person; all through the years I wondered at the work pace he maintained. Not a fancy dresser or a flashy person, he worked hard to get his goals achieved.

Because of what I know about Greg's character, I would trust him in any personal situation that could arise. Greg asked me to write this character reference pertaining to a Department of Education matter. I whole heartedly and enthusiastically endorse his character as regards his labor of love, his past school endeavor.

Sincerely,

Henry Feltenberg

# PROOF OF SERVICE (1013A C.C.P.)

COUNTY OF LOS ANGELES )
                         ) ss.
STATE OF CALIFORNIA )

I, Cathryn J. Collins, do hereby declare and state:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is *315 South Beverly Drive, Suite 305, Beverly Hills, California 90212.*

I served the foregoing documents described as: ***DEFENDANT'S POSITION PAPER REGARDING SENTENCING*** on interested parties through their attorneys of record by placing true and correct copies in this action by serving as designated below:

❏ **BY FIRST CLASS MAIL** (C.C.P. §§ 1013(a), et seq.): I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with United States postal service on that same day with postage thereon fully prepaid at Beverly Hills, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit. I placed [ ] the original [ ] or a true copy thereof enclosed in a sealed envelope addressed as above and delivering such envelopes as follows:

*\*\*\*SEE ATTACHED SERVICE LIST\*\*\**

❏ **BY OVERNIGHT OR EXPRESS MAIL SERVICE** (C.C.P.§§ 1013 (c)(d) et seq.): The above-described document(s) will be deposited with an express overnight service carrier in a sealed envelope.

❏ **BY FIRST CLASS MAIL** (C.C.P. §§ 1013 (c)(d) et seq., et seq.) - The above-described document(s) was said to be deposited with the United States Mail, postage prepaid, return receipt requested, signed by addressee that said document(s) were received..

❏ **BY HAND DELIVERY/PERSONAL SERVICE** (C.C.P. §§ 1011, et seq.) I delivered such envelope by and to the addressee's.

❏ **BY FACSIMILE TRANSMISSION** (C.C.P.§§ 1012.5, et seq.) - I caused said document(s) to be telecopied to each addressee's facsimile number.

❏ (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

❏ Executed on *October 24, 2007*, Beverly Hills, California 90212- 4309.

_CATHRYN J. COLLINS_
LEGAL ASSISTANT
                                          *Signature*

DEFENDANT'S POSITION PAPER REGARDING SENTENCING

# *SERVICE LIST*

### *UNITED STATES of AMERICA  -vs- GREGORY WONG*
### *CASE # CR 06-530-SJO*

| BRUCE H. SEARBY, AUSA *UNITED STATES ATTORNEY'S OFFICE* 1300 United States Courthouse 312 North Spring Street Los Angeles, California 90012 (O)  213.894.5423 (F)  213.894.6436 bruce.searby@usdoj.gov | **Attorneys for *The United States*** |

DEFENDANT'S POSITION PAPER REGARDING SENTENCING